UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES,<br><br>               Plaintiff,<br>    v.<br><br>DOUVER BRAGA,<br><br>               Defendant. | CASE NO. 2:22-cr-00169-TL<br><br>ORDER ON MOTION FOR REVOCATION OF DETENTION ORDER |

This matter is before the Court on Mr. Douver Braga's Motion to Review and Revoke Detention Order ("Motion to Revoke Detention"). Dkt. No. 48. Mr. Braga appeals the July 31, 2025, order of the Honorable Michelle L. Peterson, United States Magistrate Judge (Dkt. No. 42). Having conducted a *de novo* review and considered the Indictment (Dkt. No. 1), Mr. Braga's motion, the Government's response (Dkt. No. 56), Mr. Braga's reply (Dkt. No. 63), the Government's supplemental opposition brief (Dkt. No. 67), Mr. Braga's response to the Government's supplemental opposition brief (Dkt. No. 70), and the relevant record, the Court DENIES Mr. Braga's motion.

ORDER ON MOTION FOR REVOCATION OF DETENTION ORDER - 1

## I. Background

On October 5, 2022, a grand jury indicted Mr. Braga on twelve counts of Wire Fraud and one count of Conspiracy to Commit Wire Fraud in violation of 18 U.S.C. §§ 1343 and 2. Dkt. No. 1. The charges concern allegations that Mr. Braga and others devised a scheme and artifice to defraud and persuade investors to entrust Mr. Braga and others with funds that were to be invested in a cryptocurrency trading platform called Trade Coin Club ("TCC"). *Id.* at 1–2. TCC's platform was allegedly hosted on servers in this District. Dkt. No. 56 at 4. Mr. Braga is alleged to have claimed TCC would earn profit for investors, when, in fact, there was no trading, but instead a misappropriation of a significant amount of funds for the financial gain of Mr. Braga and others. Dkt. No. 1 at 2. The Government alleges that Mr. Braga raised hundreds of millions of dollars from people all over the world, with a promise that the investors' funds would be invested in a sophisticated software program, earning high returns. Dkt. No. 56 at 1. Instead, Mr. Braga allegedly used money from new investors to pay off old investors. *Id*. at 1–2. Ultimately, Mr. Braga's alleged scheme collapsed, and Mr. Braga stole $50 million in bitcoin. *Id*. at 2.

On October 5, 2022, a warrant was issued for Mr. Braga's arrest. Dkt. No. 3 (Order Issuing Bench Warrant). When Mr. Braga found out about the arrest warrant, he volunteered to surrender to the FBI in Geneva. Dkt. No. 48 ¶ 1. Instead, he was arrested by Swiss authorities at the request of the United States at the Geneva airport while on his way to Brazil. Dkt. No. 56 at 7. Mr. Braga did not contest extradition and was transported to this District for his arraignment. *Id.*

The Government moved for a pretrial detention hearing, asserting that the case was eligible for detention under 18 U.S.C. § 3142(f) because of a serious risk of flight and a serious risk of obstruction of justice, including intimidation of a prospective witness or juror. Dkt. No. 18 at 2. The Government also asserted that Mr. Braga should be detained because there are

no conditions of release that will reasonably assure his appearance as required and the safety of all other persons and the community. *Id.* At Mr. Braga's detention hearing on February 28, 2025, Judge Peterson ordered Mr. Braga's detention, citing that Mr. Braga "posed a risk of nonappearance for several reasons." Dkt. No. 23 at 1. First, Judge Peterson found that the underlying charges involved a $290-million Ponzi scheme and that much of the proceeds had not been recovered, and therefore were available to Mr. Braga. *Id*. at 1–2. Second, Judge Peterson found that the weight of the evidence "strongly favors detention." *Id*. at 2. Specifically, she determined that the evidence shows Mr. Braga making representations about investing with TCC when, in fact, there was no investing and no trading. *Id*. Lastly, she found that Mr. Braga is a citizen of Brazil, has family in Brazil, has limited ties to this District, and has vast resources in Brazil, and that Brazil does not have an extradition treaty with the United States. *Id*. Mr. Braga moved for reconsideration (Dkt. No. 36 (Motion for Reconsideration)), but on July 31, 2025, Judge Peterson found that Mr. Braga was still a flight risk and denied Mr. Braga's motion (Dkt. No. 42).

Mr. Braga moves for the revocation of the detention order and seeks his release pending trial. Dkt. No. 48. The Government opposes the request. Dkt. No. 56.

## II. LEGAL STANDARD

### A. Standard of Review

If a person is ordered detained by a magistrate judge, the individual "may file, with the court having original jurisdiction over the offense, a motion for revocation of the order." 18 U.S.C. § 3145(b). A district court reviews the detention order *de novo*. *United States v. Koenig*, 912 F.2d 1190, 1191–93 (9th Cir. 1990).

//

//

B.     **Detention Standard**

The Bail Reform Act ("the Act") requires that a court release a criminal defendant on personal recognizance or on an unsecured appearance bond before trial unless there is a determination that such release "will not reasonably assure the appearance of the person as required or will endanger the safety of any other person or the community." 18 U.S.C. § 3142(b). This default requirement is in accord with the principle that "[i]n our society, liberty is the norm, and detention prior to trial . . . is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987). The Ninth Circuit cautions that "[o]nly in rare cases should release be denied . . . ." *United States v. Santos-Flores*, 794 F.3d 1088, 1090 (9th Cir. 2015) (citing *United States v. Motamedi*, 767 F.2d 1403, 1405 (9th Cir. 1985)). Further, "doubts regarding the propriety of release are to be resolved in favor of the defendant." *Id.* If a court determines that release will not reasonably assure the defendant's appearance and the safety of the community, the court must impose "the least restrictive further condition, or combination of conditions," that will reasonably assure these goals. 18 U.S.C. § 3142(c)(1)(B). The Act only requires detention where a court finds that *no* such condition or combination or conditions can accomplish these ends. 18 U.S.C. § 3142(e)(1).

If the Government moves for detention pursuant to 18 U.S.C. § 3142(f) and a defendant is eligible for a detention hearing, then the court must determine whether there are conditions of release that reasonably assure two goals: "the appearance of the defendant as required" and "the safety of any other person and the community." 18 U.S.C. § 3142(g). In making its detention determination, a court considers the following factors: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant, including the defendant's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community,

community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. *Id*.

To obtain pretrial detention, the government bears the burden of showing "by clear and convincing evidence that the defendant poses a danger to the community or, by a preponderance of the evidence, that the defendant is a flight risk." *United States v. Kuyateh*, No. 24-186, 2025 WL 241112, at *1 (W.D. Wash. 2025) (quoting *United States v. Valenzuela*, No. CR12-62, 2012 WL 1377087, at *1 (W.D. Wash. Apr. 19, 2012) (citing *United States v. Gebro*, 948 F.2d 1118, 1121 (9th Cir. 1991))).

### III.    DISCUSSION

**A.    The § 3142(g) Factors**

**1.    Nature and Seriousness of the Offense Charged**

The allegations in this case are, without question, of a very serious nature. According to the Government, the conduct Mr. Braga engaged in amounts to one of the biggest fraud schemes this District has ever seen. Dkt. No. 56 at 1. Hundreds of millions of dollars are alleged to have been invested by alleged victims all over the world, with Mr. Braga ultimately reaping the benefit of $50 million worth of bitcoin that TCC assured investors would be invested via a sophisticated software trading program. *Id*. at 1–2.

Therefore, the nature and seriousness of the allegations weigh in favor of detention.

**2.    Weight of the Evidence**

The Government has gathered substantial evidence in this case. TCC allegedly promoted itself in various ways, including "a website, social media campaigns, promotional videos, and live overseas events in Thailand, Nigeria, and Macau, among other places." *Id*. at 4. Additionally, law enforcement claims to have numerous recordings of Mr. Braga allegedly

telling investors about TCC's sophisticated trading software and promising high return on investment. *Id*. Between 2017 and 2021, TCC allegedly received over $290 million in bitcoin from investors. *Id*. From late 2017 to early 2018, TCC investors allegedly began having problems accessing their accounts and withdrawing funds. *Id*. at 6. In 2018, TCC notified investors that it was shutting down their accounts and ending operations in the United States, resulting in thousands of victims losing some or all of their investments. *Id*. The Government alleges that Mr. Braga stole $50 million in bitcoin deposited by investors, some after complaints by investors that they could not recover their funds. *Id*. Further, the Government alleges that it has evidence that Mr. Braga concealed this income on his federal tax return and reported less than $300,000 in income during tax years 2017-2019. *Id*.

Lastly, the Government claims to have statements from a former lawyer of TCC's who "emailed Braga and stated that the company had 'very serious regulatory issues under U.S. federal and state consumer protection laws, specifically securities laws and anti-pyramid laws,'" and who told Mr. Braga, "it is imperative that Trade Coin Club not operate in the U.S. until these securities and anti-pyramid issues have been resolved." *Id*. at 5. Despite these warnings from the attorney, Mr. Braga allegedly continued to solicit investors in the United States. *Id*. TCC's attorney followed up with Mr. Braga and told him TCC was "a pyramid and an unregistered security," "may also be a Ponzi scheme," and was "violating state and federal laws." *Id*. Mr. Braga allegedly replied to the attorney saying that TCC did not operate in the United States and continued to promote TCC to investors in the United States. *Id*.

Mr. Braga contends that much of the bitcoin from TCC was transferred to other TCC principals, TCC staff, and expenses. Dkt. No. 63 ¶ 3. He also contends that because of his own personal investment in TCC, he earned significant returns (*id*. ¶ 4) and that he was not a

mastermind of TCC, pointing to various leaders within TCC who had more control of the company (*id*. ¶ 11).

Despite all the evidence the Government has and may ultimately bring to bear in this case, Mr. Braga is presumed innocent before trial, and nothing in the Court's analysis may be construed as modifying or limiting that presumption. 18 U.S.C. § 3142(j). Further, the Ninth Circuit has repeatedly declared that the weight of the evidence is the least important factor, and the statute neither requires nor permits a pretrial determination of guilt. *Gebro*, 948 F.2d at 1121. *See also United States v. Hir*, 517 F.3d 1081, 1090 (9th Cir. 2008); *United States v. Winsor,* 785 F.2d 755, 757 (9th Cir. 1986); *Motamedi*, 767 F.2d at 1408.[1]

Therefore, while the Court finds that the weight of the evidence weighs in favor of detention, it treats this factor as the least important.

### 3. The History and Characteristics of Mr. Braga

Prior to the current allegations, Mr. Braga had no criminal history. Dkt. No. 72 at 2 (Third Suppl. Pretrial Services Rpt.). As such, at the time of the alleged offense, Mr. Braga was not on probation, parole, or any other form of release pending trial. He also has no history of failing to appear for court hearings. He has no history of flight from court proceedings. The Government has not provided any evidence that Mr. Braga has a history of drug or alcohol abuse. Despite the seriousness and weight of the allegations, it is notable that Mr. Braga cooperated with law enforcement when notified about these allegations. Dkt. No. 48 ¶ 1. Upon finding out about the warrant for his arrest, Mr. Braga offered to voluntarily surrender to the FBI in Geneva, Switzerland. *Id*. The Government concedes that Mr. Braga waived extradition. *Id*. at

---

[1] The Court notes that the Government failed to provide any support for its assertions regarding warnings from the lawyer for TCC to Mr. Braga regarding potential regulatory and legal issues with the company operations in the United States. *See* CrR 12(b)(2). However, these allegations relate to the least important factor in the detention analysis and, therefore, do not weigh significantly in the Court's ultimate decision.

7. Mr. Braga did this despite the delays and defenses extradition hearings can afford. Dkt. No. 63 at 9.

Mr. Braga has no ties to the Western District of Washington, as he is originally from Brazil and, when he formerly lived in the United States, he resided in Florida. Dkt. No. 56 at 2. He does, however, have family in the United States. Mr. Braga's sister lives in Texas. Dkt. No. 48 ¶ 30. His mother and brother live in Florida. *Id*. In an effort to show willingness to remain in this District and develop ties to the community, Mr. Braga proposes renting housing in this District, with his mother being the third-party custodian. Dkt. No. 72 at 2.

Therefore, under § 3142(g)(3)(A) and (B), the history and characteristics of Mr. Braga weigh in favor of release.

### 4. Danger to Any Person or the Community

The relevant inquiry is whether the Government can prove by clear and convincing evidence that Mr. Braga poses a *future* harm of danger to the community. *See Salerno*, 481 U.S. at 751 ("Under the Bail Reform Act, . . . a judicial officer evaluates the likelihood of future dangerousness . . . ."). The Government does not address whether Mr. Braga poses a danger to any person or to the community. *See* Dkt. Nos. 56, 67. The Court finds that, if released, Mr. Braga is not a danger to any person or to the community. Given that Mr. Braga has no criminal history and the allegations are nonviolent, there is no indication that, if released, he would harm any individual or the community at large. Additionally, the scheme that Mr. Braga allegedly concocted is now defunct. With substantial court oversight, including pre-trial services and GPS monitoring in released, Mr. Braga would most likely not be able to harm individuals in the same way he allegedly did during this scheme. There is no indication he is able or willing to harm individuals or the community in any other fashion.

Therefore, the lack of danger to any person or the community weighs in favor of release.

B.  The Government's Showing

   1.  Danger to the Community

The Government bears the burden of showing by clear and convincing evidence that Mr. Braga poses a danger to the community. *Kuyateh*, 2025 WL 241112, at *1. The Government fails to do so here. *See supra* Section III.A.4.

   2.  Risk of Flight

The Government bears the burden of showing, "by a preponderance of the evidence, that the defendant is a flight risk." *Kuyateh*, 2025 WL 241112, at *1. For a number of reasons, Mr. Braga argues he is not a risk of flight, while the Government argues he is a flight risk. The Court finds that Mr. Braga is a flight risk.

       a.  Access to Cryptocurrency

Mr. Braga focuses on Judge Peterson's finding that Mr. Braga may have access to a cold storage wallet containing bitcoin. Dkt. No. 48 ¶ 4. To refute this allegation, Mr. Braga discusses his retention of MyKYC Crypto Compliance, a forensic blockchain analysis firm. *Id*. ¶ 18. Mr. Braga argues, in part, that he does not have access to the crypto cold wallet, or any cryptocurrency, because of findings in the firm's report. *Id*. The report concludes "that every address is controlled by a centralized cryptocurrency exchange[ and] has a current balance of zero BTC . . . . Once Bitcoin enters a custodial wallet of a centralized exchange, the depositor no longer has possession of the private keys for that wallet." Dkt. No. 48-1 at 48 (Forensic Blockchain Analysis Report).

Although the report is very detailed, the Court finds there are glaring problems with its reliability. First, the report does not include an author name or contact information. Dkt. No. 48-1. It has a signature at the very end with no printed name attached. *Id*. at 54. Second, because there is no author name, the Court also does not know the credentials and reliability of

the author. Mr. Braga has not presented the author's educational background, professional background, experience level—nothing to demonstrate why the Court should take this report at its word. Lastly, the Court knows nothing about the firm that is associated with the author of this report. Mr. Braga does not provide any information about this firm, whether they have a history of providing reports for court purposes, or anything illustrating their reliability. As such, the Court does not find the use of this expert or the expert's findings persuasive.

### b. *Access to Assets*

Even if Mr. Braga does not have access to the cold wallet, this Court finds that he likely does have access to significant assets, despite some being seized. First, the Government provides a declaration from FBI Special Agent Spencer Walker, which outlines his communication with Brazilian Federal Police Chief Investigator Oto Andrade.[2] Dkt. No. 75 (Walker Decl.). The Government proffers that Brazilian law enforcement allege that Mr. Braga laundered his money through a vast commercial real estate operation.[3] Dkt. No. 56 at 6. This real estate operation allegedly includes 131 properties. *Id*. Brazilian law enforcement executed search warrants at nine locations belonging to Mr. Braga, finding homes, boats, luxury cars, and a cryptocurrency wallet. *Id*. at 7. Agent Walker attests in his declaration that he was present for a search warrant executed

---

[2] Statute and case law provide that in the context of detention hearings, proffers can be made and that "[t]he rules concerning admissibility of evidence in criminal trials do not apply to the presentation and consideration of information at the hearing." 18 U.S.C. 3142(f); *Winsor*, 785 F.2d at 756; *see also United States v. Graham*, No. CR20-156, 2021 WL 75256, at *3 (2021); *United States v. Cabrera-Ortigoza,* 196 F.R.D. 571, 575–76 (S.D. Cal. 2000) ("The use of proffers and hearsay evidence are a necessary ingredient to the effective working of the Bail Reform Act, and prevention of a mini trial, or an early discovery expedition further facilitates those goals.").

[3] The Court ordered the Government to submit a praecipe to its supplemental filing with support for the assertions in its Supplemental Brief. Dkt. No. 74. While the Government submitted the First Supplemental Pretrial Services Report in support of its opposition to Mr. Braga's motion, that report provides information relayed to the probation officer by the Government. Dkt. No. 57 (sealed). The Court also should have directed the Government to file a praecipe with support for the assertions in its opposition relating to the asserts regarding Mr. Braga's real estate holdings in Brazil. However, the Court will accept the proffer in the Government's opposition without a supporting declaration this time, *see* CrR 12(b)(2), as it is consistent with the representation by Agent Walker that Mr. Braga "still has liquidity and hidden assets." Dkt. No. 75 at 2. Further, the information contained in Agent Walker's declaration (*id.*) provides sufficient basis for the Court's decision.

by Brazilian law enforcement. Dkt. No. 75 at 1. Although Brazilian law enforcement seized some belongings of Mr. Braga's, they make clear that their investigation has shown that Mr. Braga still has liquidity and hidden assets. *Id.* at 2. According to Brazilian law enforcement, "[e]lectronic communications discovered on seized phones show that Braga had placed a substantial amount of his funds and assets in the names of third parties." *Id*. Additionally, Brazilian law enforcement notified the Government that there are allegedly three people— Mr. Braga's wife, his accountant, and an attorney (not associated with this case)—who have helped Mr. Braga conceal assets. *Id*. The Government also asserts that Mr. Braga has hidden assets in Portugal.[4] *Id*.

If the allegations of hidden assets are true, this would not be the only time that Mr. Braga apparently concealed assets from law enforcement. For example, when interviewed by pre-trial services, Mr. Braga did not disclose his vast commercial real estate business collection—instead asserting he owns three homes and has a construction business. Dkt. No. 21 at 3. Further, although Mr. Braga argues that he does not have resources to flee GPS monitoring (Dkt. No. 48 ¶ 14), the Court is unpersuaded because of apparent outstanding assets, as outlined by Agent Walker's declaration referencing in-person and electronic communication with Brazilian Agent Andrade (Dkt. No. 75 1–2). Additionally, the Court does not find Mr. Braga's arguments persuasive that, on one hand, the Court should believe that he has no reason to flee to Brazil because he would immediately be arrested on "serious charges of wire fraud, conspiracy, and money laundering" (Dkt. No. 48 ¶ 14), while on the other hand, the Court should reject all claims in the Government's supplemental brief of these same allegations because it is getting the information "second-hand" from Brazilian law enforcement (Dkt. No. 70 at 2).

---

[4] Notably, Mr. Braga told pre-trial services that he owns a home in Portugal. Dkt. No. 21 at 3.

ORDER ON MOTION FOR REVOCATION OF DETENTION ORDER - 11

The allegations paint a concerning picture of an individual who allegedly goes to great lengths to conceal assets from law enforcement, leading the Court to believe that Mr. Braga is a risk of flight should he be released. Even with some assets being seized, in light of Brazilian law enforcement's investigation, the Court finds that it is likely that he has outstanding assets. Ultimately, the Court is concerned not only that Mr. Braga would flee, but that if he did there will be no recourse for the court to proceed with this case, as Brazil does not extradite its citizens to the United States. Dkt. No. 56 at 10. Mr. Braga argues that he would still face a potential penalty, as "[a]rticle 7 of the Brazilian Penal Code provides for the application of Brazilian law to crimes committed abroad." Dkt. No. 63 at 8. The problem with this argument is that: (1) there is no guarantee that Brazilian authorities would bring the present case in Brazilian court; and (2) it does not answer the concern of Mr. Braga not returning to this District, should he flee to Brazil and be arrested there. Lastly, even if Mr. Braga were to be arrested in Brazil, he would at least be in his home country, where his wife and children are, around people who speak his native language, rather than on a continent far from home—all strong incentives to return.

      c.    ***Surety Bond Proposal***

As part of proposed release conditions, Mr. Braga requests to be released upon posting two surety bonds equal to $1.6 million of property in Florida. Dkt. No. 48 ¶ 5 n.3. However, this is further evidence that Mr. Braga *does* have substantial resources available to him. The Government asserts that Mr. Braga has a vast commercial real estate business in Brazil. Dkt. No. 56 at 6. While an unknown amount of that has been seized, the prospect that Mr. Braga retains vast real estate resources in Brazil leads this Court to find that risk of losing the real estate in Florida is not enough incentive not to flee.

//

//

          **d.**      *Assisting in Preparation of Defense*

Lastly, the Court will address Mr. Braga's argument that incarceration interferes with his ability to assist his counsel in preparing a defense. Dkt. No. 48 ¶¶ 32–34. The Court finds this argument unpersuasive. Importantly, Mr. Braga argues that his access to discovery data is "limited and burdensome," but does not argue that being incarcerated prohibits access altogether. *Id.* ¶ 32. Mr. Braga goes on to argue that he "has had access to limited amounts of data because of restrictions on counsel's time to meet as well as use of electronics and other technologies needed to conduct a meaningful review and consultation." Dkt. No. 63 at 11. Mr. Braga does not, however, explain what restrictions the Federal Detention Center ("FDC") is imposing on him that interfere with a meaningful review of the discovery. More importantly, if counsel runs out of time during one jail visit, he can certainly schedule another one. While there are designated visitation times at the FDC which require planning around, counsel for Mr. Braga will have to work within those windows just like every other attorney who represents an individual who is in custody. This issue is not unique to Mr. Braga and is not a reason to release him.

In addition, Mr. Braga points out that his Brazilian counsel is not permitted to meet with him at the detention facility because he is not a United States lawyer. Dkt. No. 63 at 11. However, Brazilian counsel is able to meet with Mr. Braga if accompanied by Mr. Braga's counsel in the United States. *Id.* While the Court understands this is an inconvenience for both attorneys, the fact remains that Mr. Braga can meet with both of them, and the inconvenience is not a reason to revoke the detention order.

//

//

//

//

## IV. CONCLUSION

For the reasons explained above, the Court FINDS that the Government has met its burden to prove by a preponderance of the evidence that there is no combination of conditions of release that will reasonably assure Mr. Braga's appearance. Accordingly, the Court DENIES Mr. Braga's motion for revocation of Judge Peterson's detention order.

Dated this 7th day of November, 2025.

Tana Lin
United States District Judge